Filed 7/27/21; Modified and Certified for Publication 8/18/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re N.B., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br>     Plaintiff and Respondent, <br> v. <br> CATHERINE B., <br>     Defendant and Appellant. | A161425 <br><br> (Napa County <br> Super. Ct. No. 20JD000031) |

Appellant Catherine B. appealed after the juvenile court terminated her legal guardianship over her granddaughter N.B. She argues on appeal that the juvenile court proceeded under the wrong provision of the Welfare and Institutions Code[1] and that the error was not harmless. While we recognize, as did the juvenile court, that Catherine loves N.B., we disagree that the court proceeded under the wrong provision. We therefore affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

N.B. and her older sister were removed from their parents' care in 2008 when they were one and two years old, and their parents thereafter failed to reunify with them. Catherine began caring for the girls during this time, and she became their legal guardian in September 2012, when N.B. was five years old. The girls' maternal aunt also became a co-guardian and provided support.

Years later N.B. struggled with her mental health and Catherine had trouble managing her care. N.B. came to the attention of the Butte County Children's Services Program in early 2019 when she threatened Catherine with a knife and police were called. A section 300 dependency petition was filed in April 2019, and the juvenile court ultimately found that N.B. was suffering serious emotional damage (§ 300, subd. (c)) and that her parents had left her without provision for support (*id.*, subd. (g)). N.B. stayed in Catherine's care as they received family-maintenance services. Butte County provided in-home support three to five times each week, individual therapy for both Catherine and N.B., as well as therapeutic crisis-intervention skills training for Catherine. A Napa County social worker who later spoke with the service provider stated that "they did an excellent job" providing family support.

Butte County first reported progress in N.B.'s behaviors and school attendance. But in January 2020 N.B. was admitted to a psychiatric hospital for around two weeks after she overdosed on her antidepressant medication to hurt herself. She was released to her maternal aunt's care in Napa when she was discharged in February 2020 after she said she did not feel safe returning to Catherine's care. The aunt reported that N.B. lived with her in

2

Napa and that they received family-maintenance services there. The matter was thus transferred from Butte County to Napa County. The Napa County juvenile court in May 2020 adopted a plan of family maintenance and continued the matter for a 12-month review hearing.

The maternal aunt soon became "overwhelmed" caring for N.B. and returned her to Catherine around Mother's Day without the knowledge of respondent Napa County Health and Human Services Agency (Agency). N.B. lived full-time with Catherine, but Catherine would periodically take her to Napa to make it appear to the social worker that N.B. was living with the maternal aunt. N.B. acted out in Catherine's care and at one point threw a box with a computer inside, and at another point snuck out of the house at night. She was admitted to the Butte Crisis Response Unit in June because she was threatening self-harm if she had to stay with Catherine. The Agency asked that N.B. be removed from the custody of both Catherine and the maternal aunt.

The Agency in late June filed a petition under section 388 (section 388 petition) seeking to terminate the guardianship rights of the maternal aunt as well as the family-maintenance services the aunt was receiving. It also filed a supplemental dependency petition (§ 387) alleging that Catherine and the maternal aunt fabricated the story that N.B. was living with the aunt, lied to an Agency social worker about N.B.'s whereabouts and well-being during several phone conversations, and also had asked N.B. to lie during home visits in Napa that she was living there when in fact Catherine was transporting her there for the purpose of the visits. N.B. told a social worker that she did not want to live with Catherine because her grandmother could not take care of her.

Following a July detention hearing, the juvenile court ordered N.B. removed from the maternal aunt's care and vested N.B.'s placement and care with the Agency. N.B. was at that time placed in a foster home. N.B. "stabilized" after she was removed from Catherine's care.

In August, the Agency filed another section 388 petition, this one seeking to terminate Catherine's legal guardianship of N.B. In a section 388 report filed in advance of the hearing, the Agency described the challenges Catherine faced with N.B. Catherine appeared focused on having the dosage of N.B.'s antidepressant medication increased in order to control N.B.'s behavior. The report described Catherine as combative with service providers, as she communicated with them "in a demanding and condescending manner in order to meet her own personal objectives for [N.B.]'s treatment" and at one point yelled at a psychiatric nurse practitioner when the nurse said the dose of N.B.'s antidepressants would not be increased. Catherine told the social worker she was open to relinquishing guardianship if she felt confident that N.B. would get the help she needed. The report acknowledged that there was a "loving family bond" between N.B. and Catherine and that it was "apparent that this family has overcome many obstacles together and that [Catherine]'s journey as a single-grandparent providing care for her two grandchildren has been a labor of love." The Agency nonetheless recommended terminating Catherine's legal guardianship because of her "demonstrated inability to meet [N.B.]'s needs in spite of a wealth of support from community service providers over the last two years." The juvenile court scheduled a hearing on both section 388 petitions to terminate the guardianships of Catherine and the maternal aunt.

N.B. was placed in August 2020 with a foster family in Butte County but changed placements to a different county in October after the foster

parent had an emotional crisis that prevented her from caring for N.B. Despite the changes, N.B. did well, and visits with Catherine also went well. The Agency did receive complaints from the principal of N.B.'s new school that Catherine was harassing teachers and threatening to hire a lawyer because she did not have access to an online "parent portal" at the school to protect the foster family's privacy (she did have access to teachers' information as well as N.B.'s attendance and progress reports).

At the hearing held on November 12, Catherine's counsel objected that it would be "extremely premature" to terminate guardianship before offering services to Catherine. A therapist from Butte County who provided clinical support to N.B.'s psychiatrist in 2017 testified briefly and stated that she observed Catherine to be actively involved with N.B.'s care.

The Napa County social worker testified that Catherine contacted her frequently about N.B.'s medication, doctors' appointments, and schooling; and she was "actively engaged" in N.B.'s care. But Catherine was not offered services in Napa County after the social worker reviewed the services Catherine had received in Butte County and observed "the pattern of behavior that we were seeing with current service providers, . . . a pattern of antagonistic controlling behavior. That [Catherine] was unwilling to recognize her role and [N.B.]'s reactions and responses and behavior. I saw a caregiver who was pathologizing a young child, as opposed to really working with service providers to understand where [N.B.] was coming from and what she needed. I saw a care provider who was consistently shifting blame on to [N.B.] for the behaviors, and stating that [N.B.] needed to underst[and] her illness better, that [N.B.] needed to change, that [N.B.] needed to realize the rules of the home, that [N.B.] needed medication, that [N.B.] needed to be hospitalized in order for [Catherine] to be able to provide good care for her."

The social worker considered it "significant" that Catherine received a year of intensive support services in Butte County yet did not improve, and in fact she was "unwilling[] to participate, firing service providers who didn't agree with her. [She was not] willing to try on new parenting techniques. We've seen that same behavior in the last few months, where when [Catherine] requested a medication increase for [N.B.], and the psychiatric nurse practitioner did not agree, [Catherine] called her incompetent and went to her supervisor."

The Agency's goal was to find a concurrent home for N.B. while ensuring that she "continues to have a[n] ongoing healthy relationship with her Grandmother and her sister and the rest of her family." The Agency also recommended increased visitation between Catherine and N.B., and the social worker testified that "ideally she [Catherine] would be able to develop a good working relationship with whomever is providing care for [N.B.] and continue to be a part of her life and a support."

Catherine also testified at the hearing. She described steps she had taken over the years to provide for N.B. and to get mental-health and other services for her and her older sister. Catherine also described the trouble she experienced getting services in Butte County before that county intervened when N.B. started acting out in 2019. After the social services agency became involved, they provided "intensive home therapy" as well as therapy for N.B. But she did not receive all the services she was promised, and she testified that she would benefit from "services that would work with the family as a family unit," including sibling counseling and family counseling. She was not sure she could work with the currently assigned Agency social worker, though, because the worker did not "do her part" and "took a lot of

6

direction from the report from Butte County," which was "questionable and fraudulent." Catherine hoped to eventually reunify with N.B.

Counsel for N.B. and the maternal aunt concurred with the Agency's recommendation that the guardianships be terminated. Catherine's counsel maintained that it was "highly premature" to terminate guardianship since "Butte County boggled this case" and Catherine would benefit from additional services.

The juvenile court observed that there was not "any doubt on anybody's part that [Catherine] loves [N.B. and] that she is committed to [N.B.]" But the court was concerned that Catherine's behavior was contributing to N.B.'s problems and that she lacked insight into how to help her granddaughter. The court found that Catherine was not capable of meeting N.B.'s emotional needs and could not keep her safe and concluded that terminating the guardianships would be in N.B.'s best interest. The juvenile court terminated the legal guardianships of Catherine and the maternal aunt. Catherine appealed, but the aunt did not.

II.
DISCUSSION

Catherine argues that the juvenile court should have used a different procedure to seek termination of her guardianship and that the procedural error was prejudicial to her. We conclude the court used the proper procedure, and we therefore need not address her argument that she would have benefitted from a different procedure.

Guardianships for Catherine and the maternal aunt were established in dependency proceedings at a selection-and-implementation hearing (§ 366.26) in September 2012. Where a guardian is appointed under this procedure, the juvenile court retains jurisdiction over the minor as a ward of the guardianship. (§§ 366.3, subd. (a)(3), 366.4, subd. (a).) Section 366.3,

7

subdivision (b)(2) and California Rules of Court, rule 5.740(d) set forth the procedure to terminate such guardianships. (See *In re Alicia O.* (1995) 33 Cal.App.4th 176, 182.) Rule 5.740(d)(4) provides that a section 388 petition must be filed in the juvenile court. Before the hearing on the petition (where it must be shown that a change to the guardianship arises from a change of circumstances or evidence and would be in the minor's best interests, § 388, subd. (a)), the social services department shall prepare a report that includes an evaluation of whether the child could safely remain or be returned to the legal guardian's home without terminating the guardianship if services were provided. (§ 366.3, subd. (b)(2).) If the petition to terminate is granted, the court may order that a new plan be developed to provide stability for the minor. (§ 366.3, subd. (b)(2); Cal. Rules of Court, rule 5.740(d)(4).) As respondent notes, this is the procedure that was followed here, consistent with caselaw and commentary. (E.g., *In re Z.C.* (2009) 178 Cal.App.4th 1271, 1277; *In re Carlos E.* (2005) 129 Cal.App.4th 1408, 1418; Seiser & Kumli on Cal. Juvenile Courts Practice and Procedure (2021 Ed.) § 2.60[9], p. 2-181; Cal Juvenile Dependency Practice (Cont.Ed.Bar 2020) § 8.54, pp. 757–759.)

There is another way to remove a minor from a guardian's care, without necessarily terminating the guardianship. The social services agency may file a supplemental petition under section 387, which provides the general procedure for removing a minor from the current caregiver and placing the child in a more restrictive placement. (*In re Carlos E.*, *supra*, 129 Cal.App.4th at p. 1419, fn. 5 ["[S]hould it become necessary to alter the court's order placing the child with a guardian, a section 387 petition would be the appropriate method for obtaining an order detaining the child and placing him or her in foster care."].) The Agency filed such a petition at the

same time it sought to end the maternal aunt's petition, before ultimately changing course and seeking to also terminate Catherine's guardianship. The hearing on such a supplemental petition is bifurcated, with the juvenile court first holding an adjudicatory hearing regarding the factual allegations of the supplemental petition, followed by a dispositional hearing if the allegations are found true. (*In re D.D.* (2019) 32 Cal.App.5th 985, 989–990; Cal. Rules of Court, rule 5.565(e).)

According to Catherine, the Agency was required to "follow the procedures and requirements of section 387" to terminate her guardianship. She claims the juvenile court should have held a dispositional hearing on the Agency's supplemental section 387 petition before it proceeded to a section 388 hearing. In support she relies on *In re Jessica C.* (2007) 151 Cal.App.4th 474. There, as here, a grandparent had been appointed as a legal guardian after reunification efforts with a parent failed. (*Id.* at pp. 478–479.) After reports of the guardian's inability to care for his grandchildren a few years later, the social services agency filed a section 388 petition seeking to terminate the guardianship, which the juvenile court granted. (*Jessica C.*, at pp. 479–480.) The appellate court concluded that petitions to terminate guardianships must follow the "more detailed procedure" set forth in section 387. (*Jessica C.*, at p. 480.) We agree with respondent that this conclusion lacks any authority and is inconsistent with the statutory scheme.

*In re Jessica C.* relied on California Rules of Court, rule 5.740, which provides that "[a] petition to terminate a guardianship established by the juvenile court, to appoint a successor guardian, or to *modify or supplement* orders concerning a guardianship must be filed in the juvenile court." (Rule 5.740(d), italics added; *In re Jessica C.*, *supra*, 151 Cal.App.4th at p. 481.) The *Jessica C.* court concluded that the words "modify" and

9

supplement" were references to section 388 (regarding petitions to modify) and 387 (regarding supplemental petitions) and that "a petition seeking to terminate a guardianship may be brought as either a petition to modify or a petition to supplement the previous order, depending on the circumstances." (*Jessica C.*, at p. 481.) But although rule 5.740 has been renumbered and modified in other ways since *Jessica C.* was decided, then as now it provides that "[t]he procedures described in rule 5.570 [regarding requests to change court orders under section 388] must be followed, and *Request to Change Court Order* (form JV–180 [the form required for a section 388 petition, see rule 5.570(b)]) must be used." (Rule 5.740(d).) While *Jessica C.* acknowledged that a petition to terminate a guardianship could be brought under section 388 "depending on the circumstances" (*Jessica C.*, at p. 481), it gave no indication when those circumstances might exist. Given that the statute governing termination of guardianships does not mention supplemental petitions under section 387 (§ 366.3, subd. (b)(2)), and the implementing Rule of Court could not be more plain that a petition to terminate a guardianship proceeds by way of a petition to modify under section 388, it is clear that it is appropriate to proceed by such a petition. In short, we reject Catherine's argument that "failure to conduct a hearing under the provisions of section 387" amounted to reversible error.

Having concluded that the juvenile court here did not err in proceeding under section 388, we need not address Catherine's argument that she was prejudiced by the procedure. We nonetheless note our disagreement with Catherine's argument that the juvenile court placed too little focus on the nature and duration of her relationship with N.B. (§ 361.3, subd. (a)(6)), as the juvenile court acknowledged there was not "any doubt on anybody's part that [Catherine] loves [N.B.], that she is committed to [N.B.], that . . . she is

10

competent [*sic*] that she can handle the situation." A review of the entire record, though, shows that the parties and juvenile court were focused on N.B.'s best interests.

We agree with *In re Jessica C.* that "the decision to remove a dependent child from the home of a relative caretaker who has assumed the role of de facto parent for several years cannot be made lightly. 'This is particularly true where, as here, the removal decision is made in the post-permanency stage of dependency proceedings in which it has been determined that reunification of a dependent child and his or her parents is no longer possible.' " (*In re Jessica C., supra,* 151 Cal.App.4th at pp. 481–482.) This was a procedurally challenging case, as it arose in a different county. It was transferred around the time the parties were subject to restrictions designed to prevent the spread of COVID-19, which meant that Catherine's attorney was not in the same room with her when she was first appointed to represent her because the hearing was held remotely. Despite such challenges, the parties and the juvenile court took it upon themselves to research the history of earlier proceedings in Butte County to determine what was in N.B.'s best interests, and there is every indication that proceedings were conducted with those interests in the foreground.

### III.
### DISPOSITION

The order terminating Catherine's guardianship is affirmed.

_____

Humes, P.J.

WE CONCUR:

_____

Banke, J.

_____

Sanchez, J.

*In re N.B.* A161425

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re N.B., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. CATHERINE B., Defendant and Appellant. | A161425 (Napa County Super. Ct. No. 20JD000031) ORDER CERTIFYING OPINION FOR PUBLICATION AND MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

BY THE COURT:[2]

The opinion in the above-entitled matter filed on July 27, 2021, was not certified for publication in the Official Reports. After the court's review of respondent's requests under California Rules of Court, rule 8.1120, it is hereby ordered that the opinion should be published in the Official Reports.

It is also ordered that the opinion be modified as follows:

In the first line of page nine, the word "petition" shall be replaced with the word "guardianship."

---

[2] Before Humes, P.J., Banke, J., and Sanchez, J.

1

In the first line of page 10, quotation marks shall be inserted before the word "supplement."

There is no change in judgment.

Dated:

_____
Humes, P.J.

Trial Court:

Superior Court of the County of Napa


Trial Judge:

Hon. Joseph J. Solga


Counsel for Defendant and Appellant:

Amy Z. Tobin, under appointment by the Court of Appeal


Counsel for Plaintiff and Respondent:

Jeffrey M. Brax, Napa County Counsel

Sherri S. Kaiser, Chief Deputy County Counsel

Douglas V. Parker, Deputy County Counsel


*In re N.B.* A161425